## In re MOLO.

United States District Court
S. D. New York.
June 3, 1952.

138

Spar & Schlem, Higgins, Brenner & Higgins, New York City, for petitioner.

Edward J. Shaughnessy, District Director, New York District Immigration and Naturalization Service, New York City, Monroe Kroll, United States Naturalization Examiner, New York City, for respondent.

GODDARD, District Judge.

Petitioner filed a petition for naturalization on March 28, 1950, claiming the benefits of Section 310(b) of the Nationality Act of 1940, 8 U.S.C.A. § 710(b). The Government objects on the ground that that section provides for naturalization of an alien who, on or after May 24, 1934, marries a citizen naturalized on or after that date, *if the alien is eligible* for naturalization, and that this alien is not eligible and is barred from becoming a citizen as he made application to be relieved from liability for training and service in the land or naval forces of the United States under the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A. Appendix, § 301 et seq.

An Iranian citizen, born on August 1, 1906, petitioner entered the United States for permanent residence on January 9, 1942, having previously been in the United States as a treaty merchant since September 17, 1940. He registered under the Selective Training and Service Act of 1940 and was classified 4–C in March, 1941 because of his alien status. In September, 1942, he was classified 3–A for dependency reasons, and on December 9, 1942 he was reclassified 1–A. A claim for exemption as a foreign official under Section 5(a) of the Act was rejected May 20, 1943. On June 21, 1943, petitioner signed DSS Form 301 and he was then classified 4–C.

His DSS Form 301 stated:

"* * * I am a citizen of Iran/Persia/, which is neutral in the present war. * * * I do hereby make application to be relieved from liability for training and service in the land or naval forces of the United States, * * *. I understand that the making of this application to be relieved from such liability will debar me from becoming a citizen of the United States."

The Selective Service System considered Iran a neutral at the time. Petitioner admits he understood the significance of his act, but states that he was influenced by his wife's ill health and that he thought he could rescind.

On January 10, 1944, after Iran became a cobelligerent, petitioner was reclassified 1–A, but was found physically unfit and declared 4–F on February 17, 1944. Thereafter, on November 21, 1944, petitioner wrote to his Local Board requesting rescission of his Form 301.

The hearing officer has recommended the denial of the petition.

The Selective Training and Service Act of 1940, as amended, provided:

"Sec. 3(a) * * * Provided, That any citizen or subject of a neutral country shall be relieved from liability for training and service under this Act if, prior to his induction into the land or naval forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President, but any person who makes such application shall

thereafter be debarred from becoming a citizen of the United States: * *." 55 Stat. 845.

Section 10 of the Act gave the President authority "to prescribe the necessary rules and regulations to carry out the provisions of this Act". It also gave him power to delegate his authority. This authority was vested in the Director of Selective Service. See CFR Cum.Supp.Reg. 603.1. The Director issued Regulation 601.2, providing:

"(c) The term 'citizen or subject of a neutral country' is used to designate an alien who is a citizen or subject of a country which is neither a co-belligerent country nor an enemy country." 32 CFR Cum.Supp.

■ Petitioner now asserts that at the time he filed Form 301, Iran was not a neutral country in fact. However, it clearly was neutral within the terms of the regulation. It did not become a cobelligerent until September 9, 1943. But petitioner challenges the regulation as inconsistent with the statute. He cites definitions of "neutral" as "indifferent, impartial", etc., and refers to the fact that after Iran was occupied by Allied troops in August, 1941, it subsequently allowed passage of matériel to Russia, and on January 29, 1942 it entered a treaty with Russia and Great Britain and broke off diplomatic relations with the Axis Powers.

In United States v. Obermeier, 186 F.2d 243, at page 247, the Court of Appeals for the Second Circuit, said:

"We start with these doctrines: (1) A regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity. (2) A regulation or administrative practice is ordinarily valid unless it is (a) unreasonable or inappropriate, or (b) plainly inconsistent with the statute." [cf. 1 Vom Baur, Federal Administrative Law, 494, 495]

Petitioner maintains that "neutral" in the statute is clear and unambiguous. In 1941, the then Attorney General Robert H. Jackson, in an address stated:

"Even during the vogue among publicists and textwriters of the theory that all wars were just and all neutrality therefore undiscriminating, modern practice—especially American practice—shows instances of discriminating, qualified neutrality." 35 Am.Journ. of Int.Law No. 2, p. 351.

■ Equivocal actions were performed by "neutral" nations and have been referred to as instances of "non-belligerency" or "benevolent neutrality". See Some Current Questions Relating to Neutrality, 37 Am.Journ. of Int.Law No. 4 at 651; "Non-belligerency" in Relation to the Terminology of Neutrality, 35 Am.Journ. of Int.Law No. 1 at 121. Whatever the validity of the various arguments, it is clear that the term was not unambiguous in fact. It is evident that the Congress did not intend to restrict "neutral" to its narrowest definition. To have done so would have cast an insuperable burden on the Selective Service System to weigh carefully every action by a "neutral" nation to determine when it superseded the bounds of .impartiality or when it returned thereto and to analyse the day by day position of each nation. A definite standard was essential for the efficient operation of the Selective Service System. Congress clearly did not intend to hamper the procurement of manpower in those critical times with such uncertainties. Such a conclusion is quite unlikely.

The Director of Selective Service adopted the regulation which, for the purposes of the Act, drew a clear-cut line and provided for the efficient and speedy administration of the Act. It clearly protected the rights of "neutrals". The Regulation was plainly a fair and reasonable one and consistent with the Act. Under that Regulation, Iran was a neutral nation when the petitioner filed Form 301.

In re Petition of Ajlouny, D.C., 77 F. Supp. 327, the court found that Palestine was not a neutral country and so the petitioner there was not barred by his having signed Form 301. The court there noted that Palestine was under mandate to Great Britain which was at war; that Palestine was geared to Great Britain under its status; and that there was no change in the relation of the countries when Pales-

tine was later deleted from the list of neutral countries. The regulation was misapplied in that case. See In re Dweck, 106 F.Supp. 169, decided by Judge Kennedy of the Eastern District of New York.

Matter of Pinchot,[1] decision of Judge Irving Kaufman on April 23, 1951, held that Iran was a neutral country within the Act on August 10, 1942, even after its treaty. Petition of Fatoullah, D.C., 76 F.Supp. 499, found Iran was neutral in May, 1943. The Department of State, in a letter dated January 25, 1949, took the position that Iran was a neutral for purposes of the Selective Training and Service Act, until its declaration of war.

The bar to citizenship was not removed by a subsequent reclassification after Iran became a cobelligerent. Machado v. McGrath, U.S.App.D.C., 193 F.2d 706, at page 710; Petition of Fatoullah, supra.

■ The petitioner's sincerity and motives are suspect in writing the letter of November 21, 1944 requesting rescission of his Form DSS 301, which he had signed on June 21, 1943. It was written nine months after he had been classified 4–F and when he was over 38 years old, and thus no longer liable to be inducted. See Petition of Perez, D.C., 81 F.Supp. 591; In re Martinez, D.C., 73 F.Supp. 101, at page 102.

The letter did not comply with the provisions of Local Board Memorandum 112, Part V, which provided that one who had filed Form 301 could volunteer for induction later by filing Form 165, "Application for Voluntary Induction". No such form was filed, nor did he express any willingness to serve. Nor did petitioner come within the ruling by the Attorney General that a claim for exemption from military service by a neutral alien whose country subsequently became a cobelligerent was a bar to citizenship unless the alien served honorably in the armed forces. He did not so serve and thus failed to remove the bar.

In view of the clear language of the statute that "any person who makes such application shall thereafter be debarred from becoming a citizen of the United States: * * *" petitioner's letter must be regarded as ineffective. See In re Martinez, supra.

■ Petitioner claims he was exempt from the Act under Section 5(a) of the Act [54 Stat. 885], as an official of the Yugoslav Government, though an Iranian national. Since his entry he had been a buyer and trader of wool fabrics. Having registered for the draft, on November 20, 1942, he filed a Foreign Official Status Notification. The Department of State merely issued him a white receipt card. His connection with the Yugoslav Government was as "Attache and Secretary of the Chief Rabbi of Yugoslavia". That activity began in November, 1942. His duties occupied one-half hour every other day and were not compensated. In October, 1944 the petitioner notified the Department of State that his connection with the Yugoslav Government had ceased. Again, this appears to be shortly after he had become 38 years old and thus not subject to the draft.

On receipt of petitioner's Foreign Official Status Notification, the Department of State informed the Selective Service System that the Yugoslav Embassy had requested the issuance of an "exemption card" by the Selective Service System. The request was rejected as the Director found petitioner did not come within Reg. 611.13 [32 CFR Cum.Supp.] which provided:

"(a) A male alien * * * is not a 'male person residing in the United States' within the meaning of Section 2 or Section 3 of the Selective Training and Service Act of 1940, as amended: provided he has in his personal possession an official document issued pursuant to authorization of or described by the Director of Selective Service which identifies him as a person not required to present himself for and submit to registration and provided:

"(1) He is a diplomatic representative, a technical attache of a foreign embassy or legation, * * *; or

1. No opinion for publication.

"(2) He is an employee of a foreign embassy, legation or consulate and a national of the country employing him who has been notified to the Department of State; or

"(3) He is an official or an employee of a foreign government and a national of the country employing him, who has been notified to the Department of State; Provided, That at the time he is notified to the Department of State, a proper representative of his government advises and the Department of State agrees that he is not in fact residing in the United States:  *  *  *".

The Department of State did not consider the petitioner as a person having diplomatic status. He did not come within Section 611.13–1. "*  *  *  A diplomatic representative, technical attache of a foreign embassy or legation, a consul general, a consul, a vice-consul, or a consular agent of a foreign government". He did not come within Regulation 611.13–2 and 3 as he was not a national of the country employing him.

■ The regulation was a reasonable implementation of the Act, and petitioner did not meet the requirements of the regulation. His claim for exemption was properly rejected.

■ The recommendation of the hearing examiner that the petition be denied, is confirmed.

Settle order on notice.